IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. AMAYA

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

DELVIN J. AMAYA, APPELLANT.

Filed July 22, 2025.    No. A-24-884.

Appeal from the District Court for Douglas County: TRESSA M. ALIOTH, Judge. Affirmed.

Ryan M. Hoffman, of Bressman, Hoffman, Jacobs & Quandt, for appellant.

Michael T. Hilgers, Attorney General, and Teryn Blessin for appellee.

PIRTLE, BISHOP, and WELCH, Judges.

BISHOP, Judge.

## INTRODUCTION

Delvin J. Amaya pled no contest to second degree murder and use of a deadly weapon (firearm) to commit a felony. The Douglas County District Court sentenced him to an aggregate of 80 to 100 years' imprisonment. Amaya appeals, claiming that the district court imposed excessive sentences and that his trial counsel was ineffective. We affirm.

## BACKGROUND

On March 5, 2024, the State filed an information charging Amaya with six counts: count 1, first degree murder, a Class IA felony, pursuant to Neb. Rev. Stat. § 28-303 (Reissue 2016); counts 3 and 5, second degree assault, a Class IIA felony, pursuant to Neb. Rev. Stat. § 28-309 (Reissue 2016); and counts 2, 4, and 6, use of a deadly weapon (firearm) to commit a felony, a Class IC felony, pursuant to Neb. Rev. Stat. § 28-1205 (Cum. Supp. 2024).

- 1 -

On September 3, 2024, pursuant to a plea agreement, the State filed an amended information charging Amaya with only two counts: count 1, second degree murder, a Class IB felony, pursuant to Neb. Rev. Stat. § 28-304 (Reissue 2016); and count 2, use of a deadly weapon (firearm) to commit a felony, a Class IC felony. At a hearing that same day, Amaya pled no contest to the two counts in the amended information. The district court advised Amaya of the various rights he would be waiving if he entered that plea, and Amaya expressed his understanding. The State provided the following factual basis for the plea:

On January 20th, 2024, . . . Amaya, was residing in his parental home in Omaha, Nebraska. At some point in the early afternoon that day, Mr. Amaya shared a social media communication with an individual with the initials C.C. and Angel Moran regarding a beef over social media posts in reference to a murder committed in 2022. As a result of that communication, a fight was set up for that afternoon and a meet-up location was established -- that being the . . . gas station at . . . South 72nd Street, Omaha, Nebraska.

Thereafter, Mr. Amaya left his home on foot. As Mr. Amaya walked to that . . . gas station where C.C. and Mr. Moran agreed to meet him, he carried a stolen 9 millimeter, Sig Sauer semiautomatic handgun, and it was loaded. Mr. Amaya arrived at the . . . gas station and remained outside of the convenience store near the gas pumps, and he waited. It was the early part of a Saturday afternoon and cars and people were coming and going consistently as Mr. Amaya waited for C.C. and Mr. Moran's arrival.

Eventually, C.C. and Mr. Moran arrived. They were in the backseat of an old Toyota Camry. That Toyota Camry had only just begun to pull into the . . . gas station's parking lot, but it didn't get far because [Amaya] pulled out his 9 millimeter handgun, walked toward the Toyota Camry, shooting at it, walking closer and closer until eventually nearly leaning inside the driver's window, all the while continuing to fire shots. Mr. Amaya fired 12 shots into that Toyota Camry. The driver was Kriss Flores. Mr. Flores took the brunt of Mr. Amaya's shots. He was struck multiple times from the middle part of his body up to his neck, and those gunshots that Mr. Amaya fired killed Mr. Flores. The front seat passenger of that Toyota Camry, Samantha Fox, was also struck by Mr. Amaya's shots. She was transported by squad to [the hospital] where she received medical attention for her injury. Similarly, backseat passenger Mr. Moran was struck by Mr. Amaya's shots. Mr. Moran too was transported by squad to [the hospital] where he received medical attention for his injury.

After Mr. Amaya fired those 12 shots, he fled the . . . gas station the same way he had arrived -- on foot. Mr. Amaya began to run back to his parental home, still carrying the 9 millimeter Sig Sauer he had used just moments earlier. . . . [H]e returned home where, . . . with the help of his parents, the murder weapon -- the 9 millimeter Sig Sauer -- was hidden in a shed behind Mr. Amaya's home. Ultimately, law enforcement located the murder weapon, conducted ballistic testing analysis, and were able to conclude that the murder weapon located on Mr. Amaya's property was the murder weapon that had fired the 12 shots at the . . . gas station.

Law enforcement were also able to locate various surveillance videos including video surveillance from Mr. Amaya's own home depicting portions of Mr. Amaya's walk to the . . . gas station, the murder event, and video surveillance depicting portions of his

return back to his parental home. Mr. Amaya was ultimately arrested that same day, January 20th, 2024. All of these events and others related to this investigation were in Douglas County, Nebraska.

The district court accepted Amaya's plea and found him guilty of the two counts in the amended information. The case was set for sentencing.

At the sentencing hearing on November 5, 2024, the district court sentenced Amaya to consecutive sentences of 50 to 60 years' imprisonment for the second degree murder, and 30 to 40 years' imprisonment for the use of a deadly weapon (firearm) to commit a felony. He was given 300 days' credit for time already served.

Amaya appeals.

## ASSIGNMENTS OF ERROR

Amaya assigns that (1) the district court imposed excessive sentences and (2) his trial counsel was ineffective because counsel "did not raise the issue of . . . Amaya's mental health issues during sentencing."

## STANDARD OF REVIEW

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020). Abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019).

## ANALYSIS

### EXCESSIVE SENTENCE

Amaya was convicted of one count of second degree murder, a Class IB felony, punishable by 20 years' to life imprisonment. See Neb. Rev. Stat. § 28-105 (Cum. Supp. 2024). He was sentenced to 50 to 60 years' imprisonment for that crime. Amaya was also convicted of one count of use of a deadly weapon (firearm) to commit a felony, a Class IC felony, punishable by a mandatory minimum of 5 years' imprisonment and up to a maximum of 50 years' imprisonment. See § 28-105. He was sentenced to 30 to 40 years' imprisonment for that crime. Both sentences are within the statutory range. As such, we review the district court's sentencing determination only for an abuse of discretion. See *State v. Blake*, 310 Neb. 769, 969 N.W.2d 399 (2022) (when sentences imposed within statutory limits are alleged to be excessive, appellate court must determine whether sentencing court abused its discretion in considering well-established factors and applicable legal principles).

When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime. *State v. Lierman, supra*. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.* See, also, *State v. Galindo*, 278 Neb. 599, 774 N.W.2d 190 (2009) (sentencing court in noncapital cases is allowed wide latitude in information it considers, including consideration of unadjudicated misconduct).

Amaya was 16 years old at the time of the current offenses, and 17 years old at the time of sentencing. According to the presentence investigation report (PSR), he was in the 11th grade at the Douglas County Youth Center.

Amaya had a history of multiple juvenile offenses dating back to 2020 that we will not recount in detail here, other than to note that there were offenses involving violence and/or weapons. All five of Amaya's juvenile cases from April 2020 to September 2023 began with probation, were followed by violations that resulted in probation being revoked, and jurisdiction was terminated unsatisfactorily in all cases in August 2024.

The probation officer conducted a "Level of Service/Case Management Inventory" as part of the presentence investigation and Amaya was assessed as a very high risk to reoffend. He scored in the "[v]ery [h]igh" risk range in the criminogenic risk factor domains for companions and antisocial pattern. He scored in the "[h]igh" risk range in the domains for criminal history, education/employment, leisure/recreation, alcohol/drug abuse, and pro-criminal attitude/orientation. And he scored in the "[m]edium" risk range in the domain for family/marital. The PSR also states:

> Through an administered Substance Abuse Questionnaire . . . Amaya was found to have significant problems related to alcohol, violence, and his emotional wellbeing. In reviewing the answers he provided on this assessment, it was noted that [Amaya] indicated that he is too aggressive, he loses his temper very fast, he can be dangerous when angered, he is a violent person, he tries to get even if hurt, he often thinks about revenge, and many of his ideas could be harmful to others.

In a "Mental Health Screening Form," Amaya "provided 10 positive responses to the 17 questions involved" and "[t]herefore, further evaluation regarding this aspect in his life may be warranted."

The probation officer stated that Amaya reported being diagnosed with depression, an impulse control disorder, and attention deficit/hyperactivity disorder (ADHD), and he reported attempting suicide at age 11. The probation officer noted that probation case notes and a prior predisposition investigation indicated that Amaya had been diagnosed with Major Depressive Disorder, ADHD, and Oppositional Defiant Disorder. Amaya had participated in therapy and medication management. He also reported a history of drug and alcohol use, and he reported being affiliated with a gang.

At the sentencing hearing, Amaya's counsel stated that his comments would be "a mitigation for the conduct that took place." Counsel pointed out that the parties involved in the shooting incident "have a history" and "it's fair to say they're from rival gang sets." Counsel stated:

There is plenty of documentation that these parties had been corresponding either by phone or message app or something about a mutual party who had passed away. I believe it was possibly a friend of the Flores/Moran crew.

What we have here is a 16 year old [Amaya] who was in communication with Mr. Flores who's 30 and Mr. Angel Moran who's 23. During those conversations, which was right before this event that took place that cost Mr. Flores his life, someone in the Flores/Moran vehicle threatens my client. Again, doesn't justify what took place, but I think it's important to know what my client, who [was] 16, given his background and life experiences, [was] trying to formulate in his child mind that he has at the time.

Counsel acknowledged that Amaya "probably shouldn't have left his home and gone to meet these individuals at the gas station that's for sure, but he did."

The video shows [Amaya] begin to start walking towards [their] vehicle and, what's important, I think, . . . is the vehicle's front window, driver side, begins to roll down. I think we've all seen movies and real-life experiences and, when that window rolls down, sometimes people pull out a gun and shoot.

Mr. Amaya tells probation -- tells the Court through his statement that's exactly what he thought was going to take place at that time.

Amaya then "walk[ed] up and he fire[d] his gun into the vehicle, as we all know. Terrible decision by all people involved in my opinion, but certainly Mr. Amaya." "I'm sure if Mr. Amaya could turn back the time and clock, he probably would have made a lot of different decisions." After the shooting, Amaya "basically ran home and, on the way, called his mom and dad"; "[t]hat's what a 16-year-old does," "that's what a child does," "not some hardened gang person who's out to make a mark."

Amaya's counsel noted that Amaya is "a child" with a history of substance abuse and "a lot of mental health issues." He attempted suicide at age 11. Later he was diagnosed with Major Depressive Disorder, an impulse control disorder, ADHD, and Oppositional Defiant Disorder; "[h]e's been on medication since age 12." Counsel also noted that Amaya was in therapy at the youth center, where he also worked on his education. Even knowing that he was going to prison, Amaya still told probation that he would "'like to graduate high school,'" "'leave the gang life behind,'" and "'be released one day from prison.'"

Amaya's counsel opined that Amaya had "a lot of mitigating factors . . . regarding the decisions he made that day." "Mercy is what we're asking for, obviously. No matter what sentence you impose, something at the minimum is a long time for this young man."

Amaya also spoke at the sentencing hearing. He apologized "to the family" and "all the friends," stating, "I didn't mean to do none of that." He also apologized to his own family "for what I put ya'll through in this whole legal battle." Amaya asked the district court "for a second chance" and to "[h]ave mercy" on him. "I'm 17. I was 16. I was scared. I'm a kid[.]" "I shouldn't have done none of that," "I was trying so hard to prove myself to everybody, and like, I just want -- I'm going to meet up, and I'm going to act like I'm tough. I was scared[.]" "I hope you got mercy on me, Your Honor."

The State "agree[d] with [defense] counsel that context matters," but argued that "[t]his was a gruesome killing over smack talk -- a senseless, purposeless, and unnecessary murder over disrespect." "Flores was riddled with gunfire," and "Amaya didn't stop until he had run out of bullets"; "[h]e unloaded his gun into an occupied car in a parking lot that was populated with people at a gas station in the middle of the afternoon, and then he left Mr. Flores for dead." The State reminded the district court that this was not Amaya's first criminal act and it was not his first violent criminal act. "At this point in his young life, aggressive, violent, criminal acts are an established pattern." Amaya "was the beneficiary of intervention services -- a rehabilitative court system in many years leading up to this murder." "He murdered . . . Flores during a period of time when he was still receiving community-based intervention, therapeutic services, and rehabilitative measures as offered during his terms of juvenile probation." "Amaya is young," "but he did this" and "he did it despite having spent years being offered services to help him build the skills and tools to live a law-abiding life." The State argued that in this case, the context of the criminal act (how it unfolded) and Amaya as the offender (his life experiences) "is aggravating on both fronts." The State urged the court to impose "a substantial period of incarceration" on Amaya.

The district court stated that it had reviewed "the entirety of the presentence investigation, the police reports in this matter, the video in this matter, [and] the letters that have been submitted." "And while I can take into account your counsel's comments as well as your comments, it's hard for this Court to believe that you were acting with a juvenile mindset[.]" The court recounted that

> [t]he video shows you walking from your home to this gas station and waiting as the car pulls up and then running directly at the vehicle and firing 12 times at a car occupied four times. For us, only one life was actually taken, but that was one too many. Two others in the car were hit by the gunfire. You even admitted in your presentence investigation you kept shooting until you had no more bullets.

"Based on [Amaya's] actions as well as [his] prior record," the court sentenced Amaya as previously set forth.

On appeal, Amaya argues that the district court "failed to apply the sentencing factors" and "did not even address [his] age, mentality, educational background, or social and cultural background" when it sentenced him. Brief for appellant at 6. Additionally, he argues that the court should not have run his sentences consecutively "because the two charges were intertwined and arose from the same transaction." *Id.* at 5. Amaya noted that at the time of the incident, he believed he was being threatened and that the occupants of the vehicle were about to shoot him. He also noted his young age, his mental health issues, and the fact that he took responsibility for his actions and showed remorse for his crimes.

The district court may not have specifically referred to factors that Amaya contends were relevant in his case, but the Nebraska Supreme Court has rejected the notion that a sentencing court is required to articulate on the record that it has considered each sentencing factor and to make specific findings as to the facts that bear on each of those factors. See *State v. Earnest*, 315 Neb. 527, 997 N.W.2d 589 (2023). To the extent Amaya is arguing that the district court abused its discretion in its weighing of various sentencing factors, we disagree. While some of the factors Amaya identifies may have weighed in favor of a more lenient sentence, others did not. Additionally, it is within the discretion of the trial court to impose consecutive rather than

concurrent sentences for separate crimes; this is true even when the crimes arise out of the same incident. *State v. Geller*, 318 Neb. 441, 16 N.W.3d 365 (2025). It is not our function to conduct a de novo review of the record to determine what sentence we would impose, see *State v. Earnest, supra*, and we cannot say the district court abused its discretion in sentencing Amaya.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Generally, a voluntary guilty plea or plea of no contest waives all defenses to a criminal charge. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019). Thus, when a defendant pleads guilty or no contest, he or she is limited to challenging whether the plea was understandingly and voluntarily made and whether it was the result of ineffective assistance of counsel. *Id.*

Amaya has different counsel on direct appeal than he did in district court. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020). Once raised, the appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims. *Id.* A record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice, or that trial counsel's actions could not be justified as a part of any plausible trial strategy. *State v. Theisen*, 306 Neb. 591, 946 N.W.2d 677 (2020).

When a claim of ineffective assistance of trial counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel. *State v. Lierman, supra*. Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Blaha, supra*. To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id.* In a plea context, deficiency depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases. *Id.* When a conviction is based upon a guilty or no contest plea, the prejudice requirement for an ineffective assistance of counsel claim is satisfied if the defendant shows a reasonable probability that but for the errors of counsel, the defendant would have insisted on going to trial rather than pleading guilty. *Id.* The two prongs of the ineffective assistance of counsel test under *Strickland* may be addressed in either order. *State v. Blaha, supra*.

Amaya assigns as error that his trial counsel was ineffective because counsel "did not raise the issue of . . . Amaya's mental health issues during sentencing." Brief for appellant at 2. Amaya "is not arguing that he was incompetent to stand trial, or to enter a plea to the charges," he "instead argues that trial counsel failed to raise the issue of mental health at the time of the presentence investigation interview or at sentencing." *Id.* at 8. He points to specific pages in the PSR that note his mental health diagnoses and prescribed medication, and he states, "[t]he [PSR] mentions these issues briefly, but does not go into detail as to any of the specific issues." *Id.* He argues, "Trial counsel, while presumably aware of Mr. Amaya's mental health and cognitive functioning issues, did nothing to gather more information to add to the [PSR], which as it stands, does not describe

the issues more than a mere mention." *Id.* at 9. "Further, nothing related to Mr. Amaya's mental health issues were mentioned by trial counsel at sentencing," and "such information likely would have been crucial at Mr. Amaya's sentencing, where the trial court is required to order a sentence that fits the offender and not merely the crime." *Id.* Amaya contends that "[t]here is a reasonable probability that the trial court would have proclaimed a more lenient sentence given Mr. Amaya's mental health issues, had they been more fully disclosed in the [PSR], and subsequently discussed at sentencing." *Id.*

In response, the State submits that the record affirmatively refutes Amaya's claim, and further, that he cannot establish prejudice. We agree with the State.

As set forth previously in this opinion, the PSR did note Amaya's mental health issues, which included a suicide attempt, mental health diagnoses (Major Depressive Disorder, an impulse control disorder, ADHD, and Oppositional Defiant Disorder), prescribed medications, and therapy. Additionally, at the sentencing hearing, Amaya's trial counsel discussed Amaya's suicide attempt, mental health diagnoses, and prescribed medications. As noted by the State, Amaya exercised his right to allocution at the sentencing hearing, "so at that time he had the opportunity to provide any further detail he deemed necessary." Brief for appellee at 15. And "[t]here is no indication that had the district court received more detail or more information regarding Amaya's mental health issues that the sentence would have been any different." *Id.* at 15.

Because the record refutes Amaya's claim that his trial counsel was ineffective for failing to raise Amaya's mental health issues at sentencing and/or because Amaya cannot show prejudice, his claim fails.

CONCLUSION

For the reasons stated above, we find that the district court did not abuse its discretion in sentencing Amaya. We further find that Amaya's ineffective assistance of trial counsel claim fails. We therefore affirm his convictions and sentences.

AFFIRMED.